Filed 2/3/22  P. v. Cook CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B300807 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA090822) |
| v. | |
| TAVNER COOK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Upinder S. Kalra, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

After he was arrested pursuant to a warrant, appellant Tavner Cook was placed in a cell with two undercover agents and made incriminating statements. The trial court granted appellant's motion to quash the arrest warrant, but denied his motion to suppress the statements appellant made in the cell because it found the arrest was independently supported by probable cause. After holding an in camera hearing with the investigating officer, the trial court also denied appellant's motions to disclose the identities of the two undercover agents.

Appellant, who was convicted of second degree murder and gang and firearm enhancements, contends the court erred by denying his motion to suppress his statements, holding an in camera hearing without the undercover agents present, and denying disclosure of the agents' identities. He also argues that the jury's consideration of eyewitnesses' level of certainty, as prescribed by CALCRIM No. 315, violated his due process rights. We reject appellant's arguments and affirm the judgment. Law enforcement had independent probable cause to arrest appellant, the trial court did not err by holding an in camera hearing without the agents present or denying appellant's motion for disclosure of the agents' identities, and appellant forfeited his instructional argument, which was also foreclosed by *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*).

## PROCEDURAL HISTORY

An amended information charged appellant and Najee Robinson with the March 8, 2015 murder of Delray Yarbrough (Pen. Code, § 187, subd. (a)).[1] The amended information further

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

alleged that the crime was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)), and that a principal personally used and intentionally discharged a firearm, causing Yarbrough's death (§ 12022.53, subds. (b)-(e)(1)). The amended information also alleged that appellant served a prior prison term (§ 667.5, subd. (b)).

Appellant's first trial ended in mistrial after the jury hopelessly deadlocked. Prior to appellant's second trial, the parties extensively litigated the admissibility of appellant's statements, which were among the evidence not introduced at the first trial. We discuss those proceedings more thoroughly below.

After the second trial, at which the statements were admitted, the jury found appellant guilty of second degree murder and found the gang and firearm allegations true. In a bifurcated proceeding, the trial court found the prior conviction allegation true. The trial court sentenced appellant to the required term of 15 years to life for the murder (§ 190, subd. (a)), plus a consecutive term of 25 years to life for the firearm enhancement, which it expressly declined to strike. The trial court struck the prison prior, thus imposing a total sentence of 40 years to life.[2] Appellant timely appealed.

---

[2] The trial court correctly recognized that the gang enhancement "really doesn't add anything" in this case, because it required appellant to serve a minimum of 15 years on his indeterminate term of 15 years to life before becoming eligible for parole. (§ 186.22, subd. (b)(5).)

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. The Incident

On the evening of March 8, 2015, Denisa Williams was sitting in her parked car on York Avenue in Hawthorne when she saw two men, whom she later identified as appellant and Robinson, walking up and down nearby driveways. Williams testified that "it looked like they were aggressive and looking anxious to do something." They approached her car, and appellant said, "Hey, bitch, where you from," which Williams understood to mean what gang was she from. Williams, a grandmother, told them she did not "gang-bang." Appellant then walked away, towards a group having a barbecue outside a nearby apartment building. Robinson told Williams they were "looking for someone," then followed appellant to the barbecue. Williams responded that she was going to call the police.

Williams got out of her car and called the police, but hung up before speaking to anyone. Shortly thereafter, Williams's brother, Yarbrough, came over and asked Williams about the men. Williams told Yarbrough they were "gang-banging"; he told her to be careful.

Shampon Beacham was attending a barbecue outside an apartment building on York Avenue when he saw appellant and Robinson enter the building's courtyard. Appellant immediately approached a fifteen-year-old boy and asked where he was from. The teenager told appellant he was not from anywhere. Appellant then approached a group of people playing dominoes. A woman in the group asked appellant if he was the person who had thrown a brick through her family's apartment window a week earlier. Appellant replied that he was, and said he would

4

do it again.  Appellant then asked, "What kind of party is this? It's 118 hood."  No one responded; Beacham testified that "it got quiet."  Appellant and Robinson left the barbecue soon thereafter.

Appellant then encountered Williams and Yarbrough on the street.  Williams testified that appellant told Yarbrough, in an "aggressive, anxious, [and] scary" tone of voice, "This is 118, cuz," and asked where he was from.  After Yarbrough responded that he did not gang-bang, appellant shook his hand and returned to the barbecue.  A few seconds later, appellant came back and said, "That's the bitch that said she was going to call the feds."  Appellant kept walking away, however, until Yarbrough said, "Let me know when you want that," in his direction.  Williams understood Yarbrough's words as a challenge to fight.

Appellant said "get the car," and Robinson ran away, toward a nearby elementary school.  Appellant then approached Williams and Yarbrough.  Williams stood between Yarbrough and appellant, facing appellant.  Yarbrough forcefully pushed her out of the way and onto the ground.  Seconds later, Williams heard three or four gunshots and saw Yarbrough on the ground. Beacham also heard four gunshots, approximately five minutes after he saw appellant and Robinson leave the barbecue.

Williams saw appellant walk away, toward the elementary school, and heard a car engine start.  Yarbrough, who was dragging himself onto the sidewalk, told her to get down "'cause they are turning around."  Williams saw a newer model metallic blue Nissan Maxima or Altima make a U-turn and drive toward them.  The car stopped near them, and she heard the driver, Robinson, say "Oh, shit" before the car "took off" toward 120th Street.

Wesley Lett, a neighbor, saw and heard Williams and Yarbrough talking to a man using "elevated" voices. He heard someone say, "go get the car," and saw another man walking up the street toward a car. Lett then heard three or four gunshots and ducked behind a parked car. When he peeked out, he saw the man who had been talking to Williams and Yarbrough walking briskly up the street; Yarbrough was crawling in the street. Lett also saw a bluish, newer model Nissan Maxima or Altima make a U-turn and drive slowly past Williams and Yarbrough; it then "took off" down 120th Street, after someone said "Oh, no." Beacham, who had run inside when he heard the gunshots, also reported seeing a "dark-colored car" drive slowly down the street. Beacham went outside to help Yarbrough after he heard Williams yell that he had been shot.

Paramedics transported Yarbrough to the hospital, where he died. Yarbrough sustained two gunshot wounds, including one to the left hip that fatally lacerated his femoral artery and vein. The parties stipulated that the two bullets the medical examiner recovered from Yarbrough's body were fired from a single firearm "consistent with a .380."

**B.     Investigation**

Hawthorne police quickly arrived on the scene. They located three expended shell casings near where Yarbrough had been. The parties stipulated that the three shell casings were .380 caliber and were fired from a single firearm. Officer Jorge Martinez interviewed Williams, who described the two men, her interactions with them, and their car before leaving for the hospital. Officer Jesus Ceniceros spoke to Lett, who also described the men and their car.

6

While Williams was at the hospital, she received a text message from her friend "Dove." The message contained a picture of a cellphone displaying a photograph of appellant. Dove told Williams he had found the phone at the scene of the shooting. Williams told Dove he should give the phone to the police. When Williams returned to the scene around 11:00 p.m., she saw Dove; he told her that a man had given the phone to the police. Williams also showed the photograph on her phone to Officer Martinez and told him it depicted the shooter.

Officer Martinez testified that, while he was at the crime scene, a man handed him a cell phone. Martinez opened the phone's case and saw that the phone was turned on and logged into an Instagram account with the username "Ice2GC." Martinez scrolled through the Instagram account and saw approximately 30 to 40 pictures of the same man; Martinez identified the man as appellant in court. Sometime later, after 11:00 p.m. that evening, Williams approached Martinez, told him she knew who the shooter was, and showed him the picture Dove had sent her. Martinez testified that the man in the photograph was the same man featured in the Instagram account he had reviewed.

Later analysis and data extraction of the phone recovered numerous photographs of appellant, many of which were admitted at trial. It also showed records of messages and calls, which aligned with T-Mobile records for a phone number belonging to appellant.

Beacham met with Detective Ralph Hernandez of the Los Angeles County Sheriff's Department on March 17, 2015.[3] Beacham gave a description of appellant, including his distinctive neck tattoo. Beacham met with Hernandez again in July 2015, and selected appellant's photo from a six-pack photo array. Beacham said he was "90 percent sure" appellant was the person who came to the barbecue. Beacham also identified appellant in court on multiple occasions, including at appellant's second trial. Beacham said there was no doubt in his mind that appellant was at the barbecue.

Williams also met with a detective in July 2015. She was unable to make an identification from a photo lineup. She identified appellant as the shooter during several court proceedings, however, including the second trial. She said she relied on the tattoo on his neck, and there was no doubt in her mind that he was the shooter. Appellant showed his neck tattoo to the jury.

Hawthorne police sergeant Kevin Keus obtained and reviewed surveillance video from the elementary school near the crime scene. The videos, which were played for the jury, showed a dark-colored vehicle park near the school around 9:10 p.m. Two men exited the car and walked down York Avenue. Around 9:15 p.m., a man ran to the car, entered the driver's seat, and made a U-turn with the car. As the car drove down York Avenue, the other man tried to get in the car, but the car did not stop. That man walked down 118th Street between 9:16 and 9:17 p.m.

---

[3] Hernandez testified that the City of Hawthorne contacted the Sheriff's Department for assistance with the homicide investigation.

8

### C.  Arrest and *Perkins*[4] Operation

On July 9, 2015, at Hernandez's direction, Los Angeles County Deputy Sheriff Bryce Chalmers arrested appellant during a traffic stop.  Appellant was driving a gray Nissan Altima at the time.

After his arrest, appellant was transported to jail and placed in a cell with two civilian agents who had been briefed about his case.  Appellant's conversation with the agents was audio recorded, and excerpts were played for the jury.  One of the agents asked appellant, "They know?"  Appellant replied, "Yeah, they already got pretty much they, like . . . ."  He continued, "they talking about a cellphone. They say they have video and all this other shit.  Um, they say a K9 identified my car and shit like that."  One of the agents asked if appellant dropped his phone, and he said "Yeah."  The agent also asked if the police "got the burner," which Hernandez testified was slang for a gun.  Appellant said no; when the agent later asked if appellant had gotten rid of the burner, appellant said, "Yeah," and later said, "everything gone."

Appellant also said no one was with him, that the police had refused to show him the video they claimed they had, and "they have to pinpoint me, man."  Appellant further stated, "They going to try to hit me with a deal."  When one of the agents asked appellant if he thought he could "beat" the charge, appellant responded, "Shit the phone—the phone is ugly.  All this – shit, I

---

[4] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*). In *Perkins*, the Supreme Court held that statements a defendant voluntarily makes to individuals he or she does not know are associated with law enforcement are admissible at trial. (*Perkins*, *supra*, 496 U.S. at p. 294.)

lost that motherfucker." Appellant later reiterated that the "the main thing" he was "worried about is just, like, the phone"; he also noted that the police had swabbed him for DNA, and said, "everything gonna be there."

### D.    Gang Evidence[5]

At the time of the incident, York Avenue was claimed by two rival gangs, the 118 Gangster Crips and the Acacia Blocc Hustlers. The 118 Gangster Crips was actually an alliance of three different gangs, the 118 Ryda Gangster Crips, the Maddass Gangster Crips, and the Hawthorne Thug Family. The 118 Gangster Crips's primary activities included felony tagging, vehicle theft, drug sales, armed robberies, shootings, drive-by shootings, and murder. Several 118 Gangster Crips suffered criminal convictions in the years prior to the incident.

The 118 Gangster Crips's symbols included the letter G and a five-point star with the letter G in the middle; members often wore clothing with sports logos that had five-point stars. In 2007, appellant was stopped with two known Maddass Gangster Crips; he was photographed wearing a hat that had a star with a G in the middle. Other photographs showed appellant and others throwing Gangster Crips signs and wearing Dallas Cowboys clothing. Appellant's older brothers were known 118 Ryda Gangster Crips with the monikers "Ice" and "Baby Ice"; appellant's moniker was "Little Ice." Hawthorne police detective Bradley Jackson testified that the Instagram user name "Ice2GC" was a reference to the moniker and the Gangster Crips. Jackson opined that appellant was a member of the 118 Gangster Crips in

---

[5] We summarize the gang evidence briefly, as it is largely irrelevant to the issues presented.

2015.[6] Based on a hypothetical that mirrored the facts of the instant case, Jackson further opined that the March 8, 2015 shooting of Yarbrough was committed for the benefit of the gang.

## II. Defense Evidence

### A. Identification

Appellant called Detective Hernandez, who testified that he interviewed Williams several hours after the incident. At that time, she told him the shooter had been "completely" covered up such that she did not see any tattoos. Hernandez did not arrange a live line-up for identification purposes and did not investigate any other potential shooting suspects. He did not show Beacham or Williams a six-pack including appellant's picture until after appellant was arrested in July 2015; Hernandez included appellant's booking photo in the six-pack.

Hernandez testified that he interviewed Niarobi Nelson, who was at the barbecue on March 8, 2015. An audio recording of the interview was played for the jury. Nelson told Hernandez that someone "banged on" her family at the barbecue and said he was the same man who previously threw a brick through their window. Hernandez showed Nelson a six-pack that included appellant's photo in position five; she said the person in position six looked "real familiar."

Appellant called several witnesses who testified about various crimes committed by Shampon Beacham.

Appellant also called an expert on eyewitness memory and suggestibility, Dr. Mitchell Eisen, Ph.D. Dr. Eisen testified that memory is not like a camera but is changeable and malleable.

---

[6] Another Hawthorne police detective, Keith Chaffin, opined that Robinson was a member of the Maddass Gangster Crips.

11

Additionally, not all incidents are committed to long-term memory; gaps in memory are filled with inferences. Memories fade over time. Each time a memory is retrieved, new information may be added, and memory is "reconstructed and updated"; post-event information can thus lead to a change in memory. Traumatic stress affects the ability to process information, and can interfere with accurate identifications. "Witness conformity" may also occur when people discuss an event and their memories conform to one another.

Dr. Eisen testified that the six-pack identification process can be suggestive. If the process is suggestive, quick and confident selection of a suspect is not associated with accuracy. "Post-identification feedback effect" can also cause witnesses to become more confident in their identifications over time. Additionally, it is not uncommon for witnesses to pick a photo resembling a perpetrator without actually recognizing him or her. In some cases, witnesses may be "100 percent certain" they are picking the right person, but are proven wrong by physical evidence.

Given a hypothetical in which a witness received a photo of a person alleged by a friend to be the perpetrator right after the crime, Dr. Eisen opined that the witness's identification would be affected by witness conformity. Given a hypothetical in which a witness described the perpetrator as having a neck tattoo and was then shown a six-pack in which only one person had a neck tattoo, Dr. Eisen opined that the lineup would be suggestive.

**B. Homeboy Industries and Gang Disengagement**

Father Gregory Boyle, the founder of gang rehabilitation program Homeboy Industries, testified that appellant was a "core

worker" at Homeboy Industries "a number of years ago." In 2014, appellant traveled with Boyle to Washington, D.C. to give talks.

Mary Ellen Burton was the chief of work readiness and training at Homeboy Industries. She testified that appellant entered Homeboy's 18-month program in the summer of 2011 and successfully completed the program. Appellant was employed at Homeboy Industries until his July 2015 arrest. Burton testified that disengaging from a gang is a process, the goal of which is to stop criminal activity and find legal employment. Severing social ties with gang members is not absolutely required, and occasional social contact with gang members is not necessarily a concern.

Christy Juarez, a case manager at Homeboy Industries, worked one-on-one with appellant from 2012 through 2015. Appellant participated in classes, education, and therapy. Appellant worked the morning of March 9, 2015, and had regular attendance at work until July 10, 2015.

Mary Nalick, a mental health clinician at Homeboy Industries, testified that everyone at Homeboy Industries was involved in the gang disengagement process. The organization provided therapy to those who wanted it, but participation was not required. Nalick was appellant's therapist from January 2013 through June 2015. Appellant attended consistently. People who are disengaging from gangs may still socialize with gang members, wear gang colors, or throw gang signs; Nalick said the gang signs may be the "last to go."

Kimi Lent, a gang intervention specialist, testified about the "life cycle" of gang membership, from enrollment to inactivity, and different life events that can "push" or "pull" people out of gangs. People can become "inactive" in a gang and still socialize with gang members and identify with the gang.

DISCUSSION

## I. Motion to Suppress

### A. Background

Appellant was arrested pursuant to a "*Ramey* warrant" issued prior to the filing of a complaint and based upon probable cause. (*People v. Ramey* (1976) 16 Cal.3d 263; *Goodwin v. Superior Court* (2001) 90 Cal.App.4th 215, 218; § 817.) The warrant was supported by an affidavit detailing an investigation into an unsolved 2009 murder in which appellant was a suspect. Though the affidavit was signed days before appellant's arrest in July 2015, it made no mention of the March 2015 Yarbrough murder. Appellant moved to traverse the affidavit, quash the warrant, and suppress the statements he made during the *Perkins* operation as fruit of the poisonous tree. The prosecution filed a written opposition.

At a hearing on the motion, affiant Detective Hernandez testified that law enforcement decided to seek an arrest warrant based on the 2009 murder because they had a *Perkins* operation set up and "wanted to stimulate conversation about the 2009 murder." Hernandez also previously testified, during an in camera hearing that ultimately was disclosed to the defense, that "we also felt that we had PC for the '09 murder, and we figured why arrest him on the 2015 and start the clock. Let's see what we can get, and then keep ticking and continue our investigation." The "face page" of the resultant arrest warrant stated that it was for "MURDER, 187 P.C., a felony"; it did not specify either the 2009 or the 2015 murder. Hernandez testified that the face page was the only page of the warrant transmitted to the gang surveillance unit that ultimately arrested appellant during a traffic stop on July 9, 2015. The deputy who arrested

14

appellant told appellant he was being arrested for the 2015 murder, which led Hernandez and other officers to "change[ ] [their] strategy" and question appellant exclusively about the 2015 murder.

The trial court granted appellant's motion to quash the arrest warrant. It also found "there is no good faith."[7] At a subsequent hearing, the court considered whether there was "an independent probable cause basis separate and apart from the warrant." The parties stipulated that the court, which had presided over appellant's first trial, could consider testimony from that trial "regarding what evidence existed prior to [appellant's] arrest." The parties did not present any further evidence, but both orally argued the issue.

The court concluded that the arrest was supported by independent probable cause. It explained that its first consideration was whether "this is objective versus subjective." Citing *Whren v. United States* (1996) 517 U.S. 806, 813 (*Whren*), the court determined that officers' subjective intentions are not relevant, so long as the circumstances, viewed objectively, justify the action. The court accordingly concluded that its finding that the officers lacked good faith in obtaining the arrest warrant "has no application for this analysis[,] . . . whether there was [*sic*] independent objective facts known to law enforcement collectively to support a finding of probable cause that Mr. Cook was guilty of the 2015 homicide in question . . . ."

The court then summarized the facts known to law enforcement at the time appellant was arrested in July 2015. These included eyewitness descriptions of the perpetrator that

---

[7] We quote the court's oral statement; a written order to which the court also referred is not in the appellate record.

15

matched appellant's appearance; surveillance video and eyewitness descriptions of a getaway car that was the same model as the car appellant was driving at the time of his arrest; the cell phone obtained near the crime scene that contained numerous photographs of appellant; the photograph of appellant Williams received from Dove and showed to Martinez on the night of the crime; and Williams's assistance in preparing a composite drawing of the perpetrator that resembled appellant. Considering the "totality of those facts together," the court was "convinced that those facts constitute a fair probability; in other words, the person of reasonable caution would entertain a belief Mr. Cook was the killer." The court accordingly concluded that "the People have met their burden, established probable cause for the felony arrest [of] Mr. Cook in 2015. This is independent probable cause separate and apart from the arrest warrant that this court quashed." The court therefore denied appellant's motion to suppress the statements he made to the *Perkins* agents in the jail cell.

### B. Analysis

Appellant contends the trial court misapplied Fourth Amendment case law and erroneously denied his motion to suppress. He argues that "the independent source rule does not save the arrest," the arrest "cannot be saved because the officers could have gotten a proper warrant," "*Whren* does not save the arrest and the subjective belief of the officer for making the arrest is relevant," and the "flagrant ruse of the illegal warrant mandates reversal." Respondent argues that the court properly denied the motion to suppress because the arrest was supported by probable cause independent of the quashed arrest warrant.

16

"'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.'" (*People v. Redd* (2010) 48 Cal.4th 691, 719.) We consider the correctness of the trial court's ultimate ruling on the motion, not the correctness of the trial court's reasons for making the ruling. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, . . . against unreasonable searches and seizures.' Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." (*District of Columbia v. Wesby* (2018) 138 S.Ct. 577, 585-586.) Arrests must be supported by either a valid arrest warrant or probable cause. (*People v. Celis* (2004) 33 Cal.4th 667, 673.) "Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime." (*Ibid.*) The arresting officer's subjective state of mind is not relevant to the existence of probable cause. (*Devenpeck v. Alford* (2004) 543 U.S. 146, 153; see also *Whren*, *supra*, 517 U.S. at pp. 812-813.) Moreover, the crime supported by probable cause need not be the crime for which the person was arrested. "The fact an officer may place a person under arrest for the wrong offense does not invalidate the arrest and require exclusion of evidence seized incident to the arrest, if the officer nevertheless had probable cause to arrest the person for another offense." (*In re Donald L.* (1978) 81 Cal.App.3d 770, 775.) "[T]here is no requirement that the offense

17

upon which the police make an arrest be 'related' to the offense for which probable cause to arrest is found to exist." (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1254 (*Rodriguez*).)

There also is no requirement that the arresting officer personally have specific knowledge of the nature and extent of the probable cause. (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1555.) "It is well settled in California officers can make arrests based on information and probable cause furnished by other officers." (*Id.* at p. 1553.) "[W]hen police officers work together to build 'collective knowledge' of probable cause, the important question is not what each officer knew about probable cause, but how valid and reasonable the probable cause was that developed in the officers' collective knowledge." (*Id.* at p. 1555.)

Here, the deputy who arrested appellant told appellant he was being arrested for the 2015 murder. The facts as found by the trial court—which the parties essentially stipulated were supported by substantial evidence—support a finding of probable cause to arrest appellant for that crime. The Hawthorne Police Department and the Sheriff's Department collectively knew at the time that Williams and Beacham had seen and described a perpetrator matching appellant's description, including the neck tattoo described by Beacham. The car appellant was driving matched witness descriptions and surveillance video of the car seen at the crime scene. The cell phone turned into law enforcement depicted numerous photographs of appellant, and one of the photographs on the phone was the same as the photograph sent to Williams and identified by her as the shooter. These facts would persuade someone of reasonable caution that appellant committed the Yarbrough shooting.

18

We reject appellant's argument that the arrest was invalid because officers could have gotten a "proper warrant." Probable cause, not the ability to obtain a warrant, is the relevant touchstone here. "When the arresting officer has probable cause to arrest for a felony, and the arrest is not made inside a residence, the arrest is valid even though made under an invalid arrest warrant." (*People v. Wright* (1990) 52 Cal.3d 367, 392, disapproved on another ground by *People v. Williams* (2010) 49 Cal.4th 405, 459.) We also reject appellant's assertion that the court erred because it erroneously applied the "independent source doctrine," which "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." (*Nix v. Williams* (1984) 467 U.S. 431, 443.) We review the trial court's ruling, not its rationale. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 145.)

Appellant further contends that "the subjective belief of the officer for making the arrest is relevant," and it is an "overstatement to say that what is in the mind of an arresting officer is wholly irrelevant." Yet *Whren* explicitly states that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (*Whren, supra,* 517 U.S. at p. 813.) Appellant urges us to instead apply the "apt precedent" of *Agar v. Superior Court* (1971) 21 Cal.App.3d 24, which he accurately asserts "held that it must first be established that the police officer believes the crime has been committed before the issue of probable cause. . . arises." *Agar*'s continuing validity after *Whren* has been called into question. (*Rodriguez, supra,* 53 Cal.App.4th at pp. 1265-1266.) But even assuming *Agar* remains valid, it is inapplicable here: the deputy who arrested appellant told appellant he was being arrested for the 2015 murder,

19

thereby demonstrating his own belief that the 2015 murder had been committed.

Relying on a different *People v. Rodriguez* (2006) 143 Cal.App.4th 1137, appellant also argues that the "flagrant ruse of the illegal warrant mandates reversal." In *People v. Rodriguez*, evidence adduced at the defendant's motion to suppress hearing suggested that the police officers who stopped his car may have fabricated the reason for the stop. (*People v. Rodriguez*, *supra*, 143 Cal.App.4th at p. 1141.) Because the officers searched the defendant's car pursuant to an outstanding arrest warrant, the trial court denied the motion to suppress without making any factual findings about the reason for the stop or the officers' credibility. (*Id.* at p. 1142.) The court of appeal reversed and remanded with directions for the trial court to determine whether the asserted reason for the stop, a broken brake light, was credible. It further directed that "*if* the trial court finds the officers' justification for stopping defendant's car was a ruse it must suppress the evidence of the drugs obtained in the subsequent search." (*Id.* at pp. 1148-1149.) The court emphasized that there was "credible evidence the officers may have invented a justification for the traffic stop in order to have an excuse to run warrant checks on the driver and passenger," and more troublingly and flagrantly, may have perjured themselves in court by testifying otherwise. (*Id.* at pp. 1143-1144.)

Appellant asserts that *People v. Rodriguez* controls here, because "the police were found to have lied." Appellant provides no record citation for this finding, which does not appear in the appellate record. The appellate record states only that the trial court "granted the motion to quash the search [*sic*] warrant" and

20

found "there is no good faith."  Even if the police did lie in connection with their efforts to obtain the arrest warrant for the 2009 murder, there is no indication that they lied, fabricated evidence, or used any ruses in connection with the 2015 murder. To the contrary, Detective Hernandez testified he shifted the focus of the *Perkins* operation from the 2009 murder to the 2015 murder after the arresting officer told appellant he had been arrested for the 2015 murder.  As discussed above, the trial court properly found that probable cause supported the arrest for the 2015 murder, notwithstanding any deficiencies in the arrest warrant.  *People v. Rodriguez* accordingly is distinguishable.

## II.    Agents' Identities and In Camera Hearing

### A.    Background

Appellant filed a motion requesting disclosure of the *Perkins* agents' identities pursuant to section 1054.1 and *Brady v. Maryland* (1963) 373 U.S. 83, both of which require the prosecution to disclose exculpatory information to the defense.  At a pretrial hearing, the trial court concluded that appellant had made a prima facie showing that disclosure was warranted, and said it would conduct an in camera hearing with law enforcement.  The court overruled appellant's objections that neither his counsel nor the agents would be present at the hearing.  The court permitted appellant's counsel to prepare written questions for the court to ask during the hearing; counsel submitted 79 questions.

After reviewing the *Perkins* recordings and transcripts, the trial court concluded that most of appellant's proposed questions were not relevant to exonerating appellant or showing that the agents were material witnesses.  The court nevertheless gave appellant's counsel an opportunity to highlight the issues and

21

discuss her questions in camera. The trial court then held the in camera hearing with Detective Hernandez, after which it found: "The People have rebutted the prima facie showing made by the defense that the informants were material witnesses. In particular, the court notes that the informants did not participate in the alleged crime, were not percipient witnesses to the alleged crime, and they do not otherwise have evidence that would aid the defense. [¶] In other words, disclosure is not essential to a fair trial. [¶] Accordingly, the court will sustain the privilege asserted by law enforcement regarding the identity of the informants utilized in the *Perkins* operation."

Appellant's counsel renewed her request for disclosure of the agents' identities during trial, asserting it was "more material than they were before." The trial court again denied the request.

## B.    Analysis

Appellant contends the trial court erred by holding an in camera hearing without the agents present. He further suggests the hearing should not have been conducted in camera, because the agents "had direct contact" with him during the *Perkins* operation and thus were not "confidential." Appellant requests that we review the transcript of the in camera hearing to determine if the trial court erred in denying disclosure. Respondent agrees that we may review the transcript; it offers no further argument on the issue.

Section 1054.1[8] requires the prosecution to disclose to the defense certain categories of evidence in its possession, including

---

[8] Although the court's ruling suggests it considered the matter under Evidence Code sections 1040 through 1042, which address a public entity's privilege to refuse disclosure of

22

"[t]he names and addresses of persons the prosecutor intends to call as a witness at trial," "[s]tatements of all defendants," "[t]he existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial," and "[a]ny exculpatory evidence." (§ 1054.1, subds. (a), (b), (d), (e).) "That discovery obligation is qualified, however, by section 1054.7, which authorizes a trial court to deny, restrict or defer such disclosure on a showing of good cause." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1105.) "'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement. [¶] Upon the request of any party, the court may permit a showing of good cause for the denial or regulation of disclosures, or any portion of that showing, to be made in camera. A verbatim record shall be made of any such proceeding." (§ 1054.7.) If the court grants the relief requested by the prosecution, "the entire record of the showing shall be sealed." (*Ibid.*)

"'We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard.' [Citations.] The proper exercise of a trial court's discretion under section 1054.7 does not violate a criminal defendant's confrontation or due process rights." (*People v. Thompson, supra,* 1 Cal.5th at p. 1105.)

We have reviewed the transcript of the *Perkins* operation and the sealed transcript of the in camera hearing contained in

---

informants' identities, appellant does not cite these provisions. He instead frames the issue exclusively as one of discovery under section 1054.1; he makes no contention that the court erred in any application of the Evidence Code.

the appellate record. The trial court properly exercised its discretion here.

Appellant cites *People v. Ruiz* (1992) 9 Cal.App.4th 1485 (*Ruiz*) in support of his assertion that the agents' presence at the hearing was "essential," but that case is inapposite. In *Ruiz*, the defendant sought disclosure of the identity of a confidential informant who witnessed the drug transaction at issue in the case. (*Ruiz*, *supra*, 9 Cal.App.4th at p. 1487.) While acknowledging that "there is no general requirement that an informant must be present or testify at an in camera hearing on a motion to disclose the informant's identity," the court concluded the informant's testimony "was essential in this case because defendant had established the CI was an eyewitness to the alleged drug transaction." (*Id.* at p. 1489.) The agents here were not percipient witnesses to the shooting incident. They also were not confidential informants of the sort discussed in *Ruiz*; the record indicates that law enforcement provided them with information relevant to the case, not the other way around.

Appellant's reliance on *Crane v. Kentucky* (1986) 476 U.S. 683 and *People v. Lanfrey* (1988) 204 Cal.App.3d 491 is similarly misplaced. Appellant did not confess to the crimes during the *Perkins* operation, and nothing in the lengthy audio recordings and transcript suggested a reasonable possibility that the agents could give evidence on the issue of guilt that might result in appellant's exoneration.

## III. CALCRIM No. 315

### A. Background

The identity of Yarbrough's shooter was a key issue at trial. Both Williams, who was unable to identify appellant in a photo array, and Beacham, who selected appellant's photo with "90

24

percent" certainty, testified that they had "no doubt" appellant was the shooter. Appellant, who presented a defense of mistaken identity, introduced evidence that barbecue attendee Nelson was unable to identify him and expert testimony that witnesses who claim to be certain of a perpetrator's identity may nevertheless be incorrect.

The trial court instructed the jury with CALCRIM No. 315, "Eyewitness Identification," which provided the jury with 15 questions to consider when evaluating eyewitness testimony identifying appellant as the perpetrator, including "How certain was the witness when he or she made an identification?" The instruction also stated, "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." Appellant did not object to or request modification of the instruction.

## B.    Analysis

Appellant now contends CALCRIM No. 315 violated his due process rights. He argues that recent scientific research has shown that a witness's level of certainty is not predictive of the witness's accuracy, and instructing the jury to consider the witnesses' levels of certainty "gave the State an unfair advantage and thus made Appellant's trial fundamentally unfair." Respondent contends this argument is forfeited due to appellant's failure to object, and was rejected on the merits in *Lemcke*, *supra*, 11 Cal.5th 644. Appellant, who requests that we excuse his forfeiture, replies that *Lemcke* is distinguishable.

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction

25

accurately states the law.  [Citation.]  In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.  [Citations.]  The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

We agree with respondent that appellant forfeited his claim of instructional error by failing to object below.  (*People v. Sánchez* (2016) 63 Cal.4th 411, 461-462; *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199-200.)  We further agree that the claim is foreclosed by *Lemcke*.

In *Lemcke*, *supra*, 11 Cal.5th 644, the Supreme Court rejected the precise argument appellant raises here.  It held that "nothing in CALCRIM No. 315's instruction on witness certainty . . . operates to 'lower the prosecution's burden of proof.'" (*Lemcke*, *supra*, 11 Cal.5th at p. 657.)  It further concluded that "the instruction does not direct the jury that 'certainty equals accuracy,'" or direct the jury to presume an identification is accurate if a witness is certain about it.  (*Ibid.*)  "Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony.  The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Ibid.*)

The *Lemcke* court also found that any correlation between certainty and accuracy suggested by the instruction was ameliorated by the defendant's presentation of expert testimony refuting that inference. (*Lemcke*, *supra*, 11 Cal.5th at pp. 657-658.) Appellant presented similar testimony by the very same expert. (See *id*. at pp. 650-652 [summarizing Dr. Eisen's testimony], 658.) The court also instructed the jury with the same "[a]dditional instructions" that the Supreme Court concluded "undercut [the] contention that the certainty language lowered the prosecution's burden of proof" (*ibid*.): those directing the jury "that it was required to consider the testimony of the expert witness, that the prosecution retained the burden to prove [appellant's] identity . . . beyond a reasonable doubt, and that witnesses sometimes make honest mistakes." (*Id*. at p. 647.) CALCRIM instructions on all those topics were given in this case. (See CALCRIM Nos. 220 [Reasonable Doubt], 226 [Witnesses], 315 [Eyewitness Identification], 332 [Expert Witness Testimony].) Appellant's assertion that *Lemcke* is distinguishable on unspecified grounds is not persuasive.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

WILLHITE, ACTING P.J.                    CURREY, J.

27